BARBARA JOHNSON & another,[1] co-administratrices,[2] *vs.*
KINDRED HEALTHCARE, INC., & others.[3]

Plymouth. September 4, 2013. - January 13, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Nursing Home. Health Care Proxy. Contract,* Arbitration, Parties, Validity,
Construction of contract. *Arbitration,* Arbitrable question. *Agency,* Scope
of authority or employment. *Statute,* Construction. *Words,* "Health care
decision."

This court concluded that the estate of a principal who had died while he was
a patient in a nursing home was not bound by an agreement to arbitrate his
disputes with that facility, where the agreement had been signed by his
wife, whose only authority to act on the principal's behalf came from a
health care proxy under which she could make all "health care decisions"
for him, and where, considered in light of the language, purpose, and
broader statutory framework of the health care proxy statute, G. L. c. 201D,
§§ 1-17, the words "health care decision" included the authority to make
only those decisions concerning a medical treatment, service, or procedure.
[781-792]

CIVIL ACTION commenced in the Superior Court Department on
October 3, 2011.

A motion to stay the proceedings and to compel arbitration
was heard by *Charles J. Hely,* J.

A proceeding for interlocutory review was heard in the
Appeals Court by *Gabrielle R. Wolohojian,* J. The Supreme
Judicial Court on its own initiative transferred the case from the
Appeals Court.

*John Vail,* of the District of Columbia (*David J. Hoey* with
him) for the plaintiffs.

*Christopher R. Lavoie* for the defendants.

---

[1]Stephanie Johnson Leslie.

[2]Of the estate of Dalton Johnson.

[3]Kindred Nursing Centers East, LLC; Kindred Healthcare Operating, Inc.;
Braintree Nursing, LLC, doing business as Braintree Manor Rehabilitation and
Nursing Center (Braintree Nursing); Barbara Webster; and Robert E. Young.

*Kelly Bagby*, of the District of Columbia, *& Rebecca J. Benson & Debra Silberstein*, for National Academy of Elder Law Attorneys (Massachusetts Chapter) & another, amici curiae, submitted a brief.

DUFFLY, J. This case presents the question whether a health care agent's agreement with a health care facility to arbitrate disputes arising from the principal's stay at that facility constitutes a "health care decision" binding on the principal pursuant to G. L. c. 201D, § 5.[4]

The plaintiffs, administrators of the estate of Dalton Johnson, filed a complaint in the Superior Court against a national operator of nursing and rehabilitation centers, one of its subsidiary nursing homes, and the operator of that nursing home, alleging, inter alia, negligence and seeking damages under the wrongful death statute, G. L. c. 229, § 2, as a result of the defendants' care of Dalton[5] while he was a resident at the nursing home.[6]

On May 24, 2007, Dalton executed a health care proxy pursuant to the Massachusetts health care proxy statute, G. L. c. 201D, §§ 1-17 (health care proxy statute). In it, he authorized his wife, Barbara Johnson, "as my Health Care Agent to make any and all health care decisions for me, except to the extent that I state otherwise." Dalton was admitted to the nursing facility operated by Braintree Nursing, LLC, doing business as Braintree Manor Rehabilitation and Nursing Center (Braintree Nursing), in September, 2007. On August 6, 2008, Barbara, in her

---

[4]We acknowledge the amicus brief of the National Academy of Elder Law Attorneys (Massachusetts Chapter) and the American Association of Retired Persons in support of the plaintiffs.

[5]Because they share a last name, we refer to Dalton Johnson and Barbara Johnson by their first names.

[6]The complaint also asserted violations of G. L. c. 93A by Braintree Nursing; sought to hold Kindred Healthcare, Inc., Kindred Healthcare Operating, Inc., and Kindred Nursing Centers East, LLC, vicariously liable for the actions of Braintree Nursing and its employees; and asserted claims for negligence and for damages under the wrongful death statute, G. L. c. 229, § 2, against Barbara Webster, a licensed practical nurse employed by Braintree Nursing. We refer to the Kindred Healthcare entities, Braintree Nursing, and Webster, collectively, as the nursing home defendants.

Dr. Robert Young was also named as a defendant. Because he is not asserted to be an employee of Braintree Nursing, the arbitration agreement at issue does not implicate the plaintiffs' claims against him, which are not before us.

capacity as health care agent, signed an agreement with Braintree Nursing "to submit any disputes that may arise between [Dalton and the nursing home defendants] for resolution by mediation, and if mediation is unsuccessful, then by arbitration" (arbitration agreement).[7] In March, 2009, while a resident of the nursing facility, Dalton suffered burns and was transported to a hospital where, on July 27, 2009, he died.

After the plaintiffs filed their complaint, the nursing home defendants sought to enforce the arbitration agreement. Contending that the agreement to arbitrate disputes arising out of Dalton's stay at the nursing facility was not a "health care decision" under the terms of Dalton's health care proxy and the health care proxy statute, the plaintiffs argued that Barbara, as Dalton's health care agent, did not have the authority to execute the arbitration agreement on his behalf. A judge of the Superior Court concluded that the arbitration agreement was "an agreement affecting the responsibilities of the health care facility toward the patient," and therefore that Barbara's decision to enter into such an agreement was a health care decision that bound Dalton. The judge ordered that the proceedings be stayed pending the conclusion of mediation and arbitration, and denied the plaintiffs' request for reconsideration. The plaintiffs thereafter filed a petition under G. L. c. 231, § 118, seeking leave to pursue an interlocutory appeal. A single justice of the Appeals Court allowed the petition, and we transferred the case to this court on our own motion.

We conclude that a health care agent's decision to enter into an arbitration agreement is not a health care decision as that term is defined and used in the health care proxy statute and, therefore, that an agreement to arbitrate all claims arising out of a principal's stay in a nursing facility does not bind the principal where the agreement was entered into solely by a health care agent under the authority of a health care proxy.

*Discussion.* Adjudication of a motion to compel arbitration, including a challenge to the validity of the arbitration agreement, is governed by G. L. c. 251, § 2 (*a*). If there is a dispute as to a material fact, "the judge conducts an expedited eviden-

---

[7]The arbitration agreement described itself as "voluntary" and "not a precondition to admission."

tiary hearing"; where, as here, "there is not such a dispute, the judge resolves the issue as a matter of law." *McInnes* v. *LPL Fin., LLC*, 466 Mass. 256, 261 (2013). We review matters of law de novo. See *Deutsche Bank Nat'l Ass'n* v. *First Am. Title Ins. Co.*, 465 Mass. 741, 744 (2013).

The plaintiffs argue that the health care proxy statute solely concerns decisions about a patient's treatment by health care professionals and, because the statute does not authorize a health care agent to make decisions about dispute resolution on the principal's behalf, the order compelling arbitration must be vacated. The nursing home defendants contend that health care decisions should be defined broadly to include decisions that "pertain[] to or [are] associated with the health care which is to be provided to the individual resident" or "arise out of and . . . are connected to" such health care. They claim that, therefore, a health care agent may decide not only whether to admit the principal to a health care facility, but also whether to enter into an agreement to arbitrate claims arising from the principal's treatment while a resident of the facility.[8]

a. *Statutory framework.* As set forth in G. L. c. 201D, § 2, "[e]very competent adult shall have the right to appoint a health care agent by executing a health care proxy." This statutory right reflects the doctrine of informed consent, which promotes an individual's "strong interest in being free from nonconsensual invasion of his bodily integrity" and protects his "human dignity and self-determination." *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 739 (1977). See *Cohen* v. *Bolduc*, 435 Mass. 608, 617 (2002) (purpose of health care proxy statute is "to support and enhance patient autonomy"). In the case of an incompetent person, who has "the same panoply of rights and choices" as a competent person, those rights may

---

[8]The narrow question presented by this case was not addressed by our decision in *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007), in which we reversed a Superior Court judge's order denying a motion to dismiss the complaint and to compel arbitration between a nursing facility and a resident. In that case, it was undisputed that the resident's "son had authority to make binding agreements on [the resident's] behalf pursuant to a validly executed durable power of attorney." *Id.* at 672. Here, however, there is no assertion that Dalton executed a durable power of attorney and that the agreement to arbitrate was signed pursuant to such authority.

be asserted by an authorized representative. See *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 746. The health care proxy statute enables an individual to designate in advance a person he or she trusts to provide such informed consent when the individual is no longer able to do so. An agent granted the authority to make health care decisions on behalf of an individual lacking capacity must do so "from the principal's perspective," in accordance with the principal's wishes, if known, or best interests, if not. *Cohen* v. *Bolduc, supra* at 618.

The manner in which the health care proxy is to be executed and the scope of authority of the health care agent are governed by G. L. c. 201D, §§ 1-17. The health care proxy statute authorizes a health care agent "to make any and all health care decisions on the principal's behalf that the principal could make, including decisions about life-sustaining treatment, subject, however, to any express limitations in the health care proxy." G. L. c. 201D, § 5. In making these decisions, the agent must assess the principal's wishes, including "the principal's religious and moral beliefs." *Id.* An agent will be removed if "not reasonably available, willing and competent to fulfill his or her obligations." G. L. c. 201D, § 17.

Echoing the language of the health care proxy statute, Dalton's health care proxy authorized his agent "to make any and all health care decisions for me, except to the extent that I state otherwise." Whether Barbara had authority to execute the arbitration agreement as Dalton's health care agent thus turns on the meaning of the phrase "health care decisions."

b. *Meaning of "health care decision."* "The object of all statutory construction is to ascertain the true intent of the Legislature from the words used." *Sullivan* v. *Chief Justice for Admin. & Mgt. of the Trial Court*, 448 Mass. 15, 24 (2006), quoting *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996). We interpret a statute according to "all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State*

*Tax Comm'n*, 367 Mass. 360, 364 (1975). "Significantly, a statute must be interpreted 'as a whole'; it is improper to confine interpretation to the single section to be construed." *Commonwealth* v. *Keefner*, 461 Mass. 507, 511 (2012), quoting *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004).

We begin with the plain language of the statute. The health care proxy statute defines "[h]ealth care" as "any treatment, service or procedure to diagnose or treat the physical or mental condition of a patient," and "[h]ealth care decision" as "a decision which is made in accordance with the requirements of this chapter, is consistent with any limitations in the health care proxy, and is consistent with responsible medical practice." G. L. c. 201D, § 1. Taken together, these definitions appear on their face to limit "health care decisions" to those that directly involve the provision of responsible medical services, procedures, or treatment of the principal's physical or mental condition.[9]

This reading of "health care decisions" gains support from language elsewhere in the statute. In particular, G. L. c. 201D, § 5, which delineates the scope of a health care agent's authority, provides that the agent has a right to all "medical information" necessary for an informed health care decision and, further, that the agent may make such a decision only "[a]fter consultation with health care providers, and after full consideration of acceptable medical alternatives regarding diagnosis, prognosis, treatments and their side effects." No language in the statute suggests that the Legislature intended a health care agent to have authority over any decision other than medical treatment decisions that the principal would have made had the principal been capable.

c. *Statutory context and history.* Moreover, the statute's language, context, and progression through the legislative process show that the Legislature intended to distinguish between a health care proxy, which limits an agent's decision-making authority on behalf of an incapacitated person to health care

---

[9]Consistent with this definition, we have said that the authority to make health care decisions encompasses the power to admit a principal to a mental health facility for treatment. See *Cohen* v. *Bolduc*, 435 Mass. 608, 616 (2002). The decision whether to execute an arbitration agreement, however, is different in kind from the decision to admit a principal to a health care facility.

decisions, and a durable power of attorney, guardianship, or conservatorship, all of which authorize broad decision-making power on behalf of an incompetent person, including over the person's financial interests and estate.[10] See *Sullivan* v. *Chief Justice for Admin. & Mgt. of the Trial Court*, 448 Mass. at 24, quoting *Murphy* v. *Bohn*, 377 Mass. 544, 548 (1979) ("Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, [and] prior legislation").

Unlike a health care proxy, a durable power of attorney can authorize an agent to make decisions affecting the principal's business, estate, finances, and legal relationships in a variety of contexts unrelated to health care. See G. L. c. 190B, § 5-502 ("All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not disabled"). In 1990, when it was contemplating enactment of House Bill No. 3006, which eventually became the health care proxy statute, the Legislature considered an alternative bill that would have combined the roles of health care agent and attorney in fact by "empowering the attorney-in-fact to enter into agreements concerning the care of the principal or concerning medical or surgical procedures." See 1990 House Doc. No. 3367. The statutory scheme enacted by the Legislature, however, maintains a distinction between these two roles, thereby recognizing that an individual may choose to appoint one person to make health care decisions based on that person's relationship with the principal and knowledge of "the principal's wishes, including the principal's religious and moral beliefs," G. L. c. 201D, §§ 5, 17, but may

---

[10]"A person may be adjudicated legally incompetent to make some decisions but competent to make others." *Cohen* v. *Bolduc*, 435 Mass. at 618 n.25, citing *Matter of Moe*, 385 Mass. 555, 567-568 (1982). The capacity "to make treatment decisions" is distinct from the capacity "to make informed decisions as to [one's] property or financial interests." See *Cohen* v. *Bolduc, supra*, quoting *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 497 (1983), and *Fazio* v. *Fazio*, 375 Mass. 394, 403 (1978).

choose someone else to make decisions that require business, estate planning, financial, or legal knowledge and experience.[11]

Consistent with this distinction, the guardianship and conservatorship statutes also grant broader decision-making authority than that recognized under the health care proxy statute. A guardian who has been appointed for a person found incompetent "shall make decisions regarding the incapacitated person's support, care, education, health and welfare . . . ." G. L. c. 190B, § 5-309 (a). Among other powers, such a guardian shall take reasonable care of the ward's personal effects, and shall apply available money of the ward to meet his or her current needs; the guardian also may apply for statutory benefits, and may consent to professional services on the ward's behalf. G. L. c. 190B, § 5-309 (a). Similarly, a conservator's extensive, enumerated powers include the power to "expend or distribute income or principal of the estate without court authorization or confirmation for the support, education, care, or benefit of the protected person and dependents," G. L. c. 190B, § 5-424 (a), and the power to "pay or contest any claim; settle a claim by or against the estate or the protected person by compromise, arbitration, or otherwise." G. L. c. 190B, § 5-423 (c) (21).[12]

---

[11]See, e.g., P.M. Annino, Estate Planning § 3.15, par. 13 (3d ed. 2007) ("Provisions that pertain to finances should be drafted in the durable power of attorney. Provisions that pertain to health care decisions should be drafted in the health care proxy"); id. at § 4.1 n.3 ("The author strongly recommends that the [durable power of attorney and health care proxy] documents be separate as they accomplish quite different objectives").

The importance of a fiduciary's knowledge and experience was emphasized in Miller v. Cotter, 448 Mass. at 682, where we described Miller, an attorney in fact, as "a sophisticated and experienced party authorized to sign agreements [including an arbitration agreement] on his father's behalf."

> "Miller showed an understanding of contracts and the language used in them during his deposition. He holds a degree in English from Tufts University and served as an intelligence officer in the United States Air Force. After leaving the military, Miller spent twenty-seven years in the insurance industry, working as a claims examiner and as a regional claims manager in a variety of divisions of his company (including medical and disability). Because of his work, he had a knowledge of arbitration. . . ."

Id. at 674.

[12]In 2008, the Legislature repealed, among other statutes, G. L. c. 201 and

Significantly, the health care proxy statute gives the health care agent priority over other fiduciaries in making health care decisions. See G. L. c. 201D, § 5.[13] Were we to define "health care decisions" broadly to encompass decisions that relate to a principal's business affairs, property, finances, or the adjudication of legal claims, all of which fall within the authority of an attorney in fact or court-appointed guardian or conservator, many decisions made by the health care agent would override the more expansive powers allocated to these fiduciaries. Such a reading would conflict with the language and intent of the health care proxy statute, which confers decision-making authority only over a narrowly defined area (health care); it also would upset the statutory scheme that grants broader authority to attorneys in fact, guardians, and conservators.

Interpreting health care decision-making as the narrow, though important, domain of the health care agent also comports with the purpose of the health care proxy statute. It permits invasions of a person's bodily integrity only with the principal's informed consent, which will be given or denied by the agent whom the principal has appointed to make such decisions consistent with

---

201B, which theretofore had governed the powers and authority of attorneys in fact, guardians, and conservators; it then codified the various provisions governing such powers and authority as part of the Uniform Probate Code. See St. 2008, c. 521, §§ 9, 21-22. This codification did not change the relationship between the powers conferred by a health care proxy and those granted under a durable power of attorney, guardianship, or conservatorship. When the health care proxy statute was enacted in December, 1990, see St. 1990, c. 332, § 1, the language in G. L. c. 201B, § 2, describing the scope of authority of an attorney in fact, was materially identical to that now set forth in G. L. c. 190B, § 5-502. See St. 1981, c. 276, § 2. Likewise, the broad powers and authorities of guardians and conservators contained within various provisions of G. L. c. 201 were substantially similar in scope and kind to those now provided by G. L. c. 190B. Compare St. 1974, c. 845, § 11; R. L. 1902, c. 145, § 25, as amended by St. 1915, c. 23; St. 1930, c. 138, § 1, as amended by St. 1976, c. 515, § 26.

[13]General Laws c. 201D, § 5, provides:

"Health care decisions by an agent pursuant to a health care proxy on a principal's behalf shall have the same priority over decisions by any other person, including a person acting pursuant to a durable power of attorney as would decisions by the principal . . . ."

See G. L. c. 190B, § 5-309 (e) ("If a health care proxy is in effect . . . a health-care decision of the agent takes precedence over that of a guardian").

the principal's wishes and belief system. See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. at 739-740. In light of the language, context, history, and purpose of the health care proxy statute, we conclude that a health care agent's decision-making authority, confined, as it is, to health care decisions, does not include the authority to bind the principal to arbitration.[14]

d. *Other authorizations and directives.* In support of their claim that the definition of a "health care decision" must include an agreement to enter binding arbitration, the nursing home defendants argue that such an agreement is no different from other decisions that a health care agent may make on a nursing home resident's behalf. As described in the nursing home defendants' brief, such other decisions include "decisions regarding whether and how to sign billing documents, decisions delineating access to the resident's mail and personal property, decisions regarding what the resident will eat and decisions pertaining to the reviewing of statements discussing the grievance procedures with state agencies."

Although it is not entirely clear what the nursing home defendants mean by "billing documents," to the extent such documents seek to hold a principal responsible for the payment of medical treatment, the health care proxy statute already directs that "[l]iability for the cost of health care provided pursuant to an agent's decision shall be the same as if the health care were provided pursuant to the principal's decision." G. L. c. 201D, § 9. Thus, a health care agent's consent to medical treatment automatically imposes liability on the principal for the costs of such treatment. A health care agent's signature on such a "billing document" merely confirms the principal's obligations to the health care facility arising from the health care proxy statute; that a health care agent can sign this document does not support the nursing home defendants' argument that a health care agent also may sign an arbitration agreement.

Moreover, many of the other decisions enumerated by the

---

[14]Because we conclude that Barbara was without authority to sign the arbitration agreement on Dalton's behalf, we do not address the plaintiffs' argument that a decedent's agreement to arbitrate future disputes does not bind the statutory beneficiaries of a wrongful death claim.

nursing home defendants could be made by any trustworthy individual with sufficient knowledge of the principal. For example, an individual does not financially or contractually bind the principal by directing where to put the principal's mail or personal effects; indicating the principal's food preferences; or authorizing third-party payments from previously selected health insurance or health care entitlements such as Medicare or Medicaid. See, e.g., 42 C.F.R. § 406.5(a) (2012) ("[Medicare h]ospital insurance is available to most individuals without payment of a premium if they . . . [a]re age 65 or over" or satisfy other requirements); G. L. c. 118E, § 9 ("Medicaid benefits shall be available to all persons eligible for financial assistance" under particular statutory provisions). Therefore, unless further restricted by law, an individual may make such decisions even without authorization under a durable power of attorney, guardianship, or conservatorship.

This is acknowledged, for instance, in the broad definition of those who may act as a patient's "Eligibility Representative" for Medicaid purposes. See 130 Code Mass. Regs. § 515.001 (2011). Although the regulation includes health care agents, attorneys in fact, guardians, and conservators, among others who may "mak[e] decisions related to health care or payment for health care," it also includes any person who "is sufficiently aware of the applicant's or member's circumstances to assume responsibility for the accuracy of the statements made during the eligibility process, and who . . . is acting responsibly on behalf of an applicant or member for whom written authorization cannot be obtained." *Id.* A person's designation in a health care proxy may establish the individual's trustworthiness and familiarity with the principal and, therefore, enable the individual to sign many of the documents included in a nursing home's admissions package. But it does not follow that such a person also can sign an arbitration agreement, which requires the power of an authorized fiduciary.[15]

e. *Other jurisdictions.* Our conclusion that a health care agent

---

[15]To the extent that the Federal Arbitration Act (FAA) applies to arbitration agreements between a patient and a nursing home, see *Miller* v. *Cotter*, 448 Mass. at 678, our reading of the health care proxy statute comports with the FAA's directive to place arbitration agreements "on an equal footing with other contracts." See *AT&T Mobility LLC* v. *Concepcion*, 131 S. Ct. 1740,

does not have the authority to bind the principal to an arbitration agreement comports with the view of a majority of courts in other jurisdictions that have considered similar issues. See, e.g., *Estate of Irons ex rel. Springer* v. *Arcadia Healthcare, L.C.*, 66 So. 3d 396, 400 (Fla. Dist. Ct. App. 2011); *Life Care Ctrs. of Am.* v. *Smith*, 298 Ga. App. 739, 744 (2009); *Ping* v. *Beverly Enters., Inc.*, 376 S.W.3d 581, 593-594 (Ky. 2012), cert. denied, 133 S. Ct. 1996 (2013); *Dickerson* v. *Longoria*, 414 Md. 419, 445 (2010); *Texas Cityview Care Ctr., L.P.* v. *Fryer*, 227 S.W.3d 345, 352-353 (Tex. Ct. App. 2007). See also *Curto* v. *Illini Manors, Inc.*, 405 Ill. App. 3d 888, 894 (2010); *Mississippi Care Ctr. of Greenville, LLC* v. *Hinyub*, 975 So. 2d 211, 218 (Miss. 2008); *Koricic* v. *Beverly Enters. Nebraska, Inc.*, 278 Neb. 713, 719 (2009); *State ex rel. AMFM, LLC* v. *King*, 740 S.E.2d 66, 75 (W. Va. 2013).

The defendants rely on *Owens* v. *National Health Corp.*, 263 S.W.3d 876, 884 (Tenn. 2007), cert. denied, 555 U.S. 815 (2008) (*Owens*), one of only a handful of cases where a court in another jurisdiction has determined that an agency created under a health care proxy statute must include the power to enter into arbitration agreements.[16] In that case, an attorney in fact, acting under a durable power of attorney for health care, signed an arbitration agreement as a precondition[17] for the principal's admission to a nursing home.[18] The Tennessee Supreme Court held that "an attorney-in-fact acting pursuant to a durable power of attor-

1745 (2011). Under the outcome we reach today, parties remain free to submit to arbitration claims of the sort at issue here: a competent patient can agree to arbitrate disputes with a health care provider, as can an appropriately authorized agent, such as an attorney in fact. Arbitration agreements are treated no differently from any other non-medical agreements that a health care proxy does not authorize a health care agent to make on a principal's behalf.

[16]See *Garrison* v. *Superior Court*, 132 Cal. App. 4th 253, 266 (2005); *Moffett* v. *Life Care Ctrs. of Am.*, 187 P.3d 1140, 1147 (Colo. Ct. App. 2008), aff'd, 219 P.3d 1068 (Colo. 2009). Cf. *Barron* v. *Evangelical Lutheran Good Samaritan Soc'y*, 265 P.3d 720, 726 (N.M. Ct. App. 2011).

[17]By contrast, the arbitration agreement signed by Barbara was "not a precondition to admission."

[18]The principal's durable power of attorney authorized her agents "to make health care decision[s] for me if I am incapacitated or otherwise unable to make such decisions for myself." *Owens* v. *National Health Corp.*, 263 S.W.3d 876, 883 (Tenn. 2007). It also contained a grant of authority broader than the one at issue here or provided in G. L. c. 201D, § 5: "the power and

ney for health care may sign a nursing-home contract that contains an arbitration provision because this action is necessary to 'consent . . . to health care.' " *Id.* at 884, quoting Tenn. Code Ann. § 34-6-201(3) (2001).[19] Relying on the Tennessee statute's language authorizing an attorney in fact to "make health care decisions . . . to the same extent as the principal," see Tenn. Code Ann. § 34-6-204(b), the court reasoned that "[b]ecause [the principal] herself could have decided to sign the nursing-home contract containing the arbitration provision had she been capable, . . . [the attorney in fact] was authorized to sign the arbitration provision on [the principal's] behalf." *Owens, supra* at 884. The court stated that signing a contract for health care services always constitutes a legal decision and that "[h]olding that an attorney-in-fact can make some 'legal decisions' but not others would introduce an element of uncertainty into health care contracts signed by attorneys-in-fact that likely would have negative effects on their principals." *Id.* at 884-885.

We frame the matter differently. That a competent principal could have decided to enter into an arbitration agreement does not answer the core question we confront: whether our Legislature intended the term "health care decision" to include the decision to waive a principal's right of access to the courts and to trial by jury by agreeing to binding arbitration. Our health care proxy statute reflects no such intent. The language of G. L. c. 201D, § 5, considered in the context of its purpose and the broader statutory framework, authorizes the agent only to make those decisions requiring a principal's informed consent to a medical treatment, service, or procedure; it does not authorize a health care agent to make all decisions that the principal could have made if competent, even those that might bear some relationship to the receipt of medical services.

Nor does the result we reach promote uncertainty concerning the scope of a health care agent's authority under G. L. c. 201D,

authority to execute on my behalf any waiver, release or other document which may be necessary in order to implement the[se] health care decisions." *Owens* v. *National Health Corp., supra.*

[19]Tennessee's authorizing statute states: "the attorney in fact designated in such durable power of attorney may make health care decisions for the principal . . . to the same extent as the principal could . . . if the principal had the capacity to do so." Tenn. Code Ann. § 34-6-204(b) (2001).

§ 5. To the contrary, the nursing home defendants' expansive reading of "health care decision" as including any decision that arises from or relates to medical treatment would render uncertain the outer limits of a health care agent's decision-making authority. Moreover, to the extent such decisions fell within the explicit, statutory authority of other fiduciaries, this broad definition could create conflicts between a health care agent and such other fiduciaries. We are not persuaded that the concerns expressed in *Owens* require us to broaden the definition of "health care decision" beyond that contemplated by our Legislature.

*Conclusion.* The order compelling mediation or arbitration, and staying the proceedings in the Superior Court pending the outcome of the mediation or arbitration proceedings, is vacated and set aside. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*